**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANA SANDOVAL, individually and as successor in interest to Ronnie Sandoval, Jr.; RONNIE SANDOVAL, JR.; JOSIAH SANDOVAL, *Plaintiffs-Appellants*, <br><br> v. <br><br> COUNTY OF SAN DIEGO; ROMEO DE GUZMAN; MARIA LLAMADO; DANA HARRIS, *Defendants-Appellees.* | No. 18-55289 <br><br> D.C. No. 3:16-cv-01004-BEN-AGS <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted October 16, 2019
Submission Vacated March 16, 2020
Resubmitted January 6, 2021
Pasadena, California

Filed January 13, 2021

Before:  Kim McLane Wardlaw and Daniel P. Collins,
Circuit Judges, and Joseph F. Bataillon,* District Judge.

Opinion by Judge Wardlaw;
Partial Concurrence and Partial Dissent by Judge Collins

---

## SUMMARY**

---

### Civil Rights

The panel ordered the appeal resubmitted, reversed the district court's summary judgment and remanded in an action brought pursuant to 42 U.S.C. § 1983 against the County of San Diego and three nurses alleging that defendants violated Ronnie Sandoval's Fourteenth Amendment right to adequate medical care while he was in custody at the San Diego Central Jail.

Sandoval died of a methamphetamine overdose at the San Diego Central Jail after medical staff left him unmonitored for eight hours, despite signs that he was under the influence of drugs, and then failed to promptly summon paramedics when they discovered him unresponsive and having a seizure.

Concluding that the district court abused its discretion by summarily sustaining the defendants' meritless—indeed

---

* The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

frivolous—evidentiary objections, the panel considered the objected-to evidence.  Turning to the merits, the panel first noted that after the district court issued its decision, this court clarified in *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018), that an objective standard applies to constitutional claims of inadequate medical care brought by pretrial detainees.  In light of *Gordon*, the district court erred by applying the subjective deliberate indifference standard to plaintiff's Fourteenth Amendment claim. Because the parties had briefed *Gordon*'s objective framework on appeal, the panel applied it here.

Applying the *Gordon* framework and viewing the evidence in plaintiff's favor, the panel held that a jury could conclude that Sandoval would not have died but for the defendants' unreasonable response to his obvious signs of medical distress.  Specifically, a jury could conclude that a reasonable nurse who was told that Sandoval was shaking, tired, and disoriented—and who was specifically directed by a deputy to evaluate Sandoval more thoroughly—would have understood that Sandoval faced a substantial risk of suffering serious harm.  Defendant Nurse Romeo de Guzman therefore was not entitled to summary judgment on liability.  The panel reached the same conclusion for the claims against Nurses Dana Harris and Maria Llamado, concluding that their failure to promptly call paramedics was objectively unreasonable.

The panel further held that plaintiff had demonstrated that the available law was clearly established at the time as to the unreasonableness of the nurses' conduct.  The panel concluded that a reasonable nurse, knowing what Llamado, Harris, and de Guzman knew, would have understood that failing to call paramedics (Llamdo and Harris), or failing to check on Sandoval for hours and failing to pass on

information about his condition (de Guzman), presented such a substantial risk of harm to Sandoval that the failure to act was unconstitutional.  Accordingly, the nurses were not entitled to qualified immunity.

The panel held that viewing the evidence in the light most favorable to plaintiff, there was a triable issue of fact as to the County's liability under *Monell v. Department of Social Services,* 436 U.S. 658, 694 (1978)*.*

Concurring in the judgment in part and dissenting in part, Judge Collins agreed with the majority's ultimate conclusion that Nurses Harris and Llamado were not entitled to summary judgment, but he would affirm the district court's grant of summary judgment to Nurse de Guzman and to the County of San Diego.  Judge Collins wrote that because in 2014, the then controlling deliberate-indifference liability standards included a *subjective* element, plaintiff had to make a showing of subjective deliberate indifference to defeat qualified immunity, and she had to do so even though that subjective element of the test for liability has since been overruled.  Because plaintiff failed to present sufficient evidence to show that Nurse de Guzman was subjectively aware of Sandoval's serious medical needs, de Guzman was entitled to qualified immunity.  Judge Collins further stated that there was no evidence that the County had an unconstitutional policy, practice or custom.  Finally, as to Nurses Harris and Llamdo, the sharply conflicting evidence indicated that they subjectively knew that the paramedics needed to be called. Because Judge Collins's reasoning differed from the majority's even with respect to Harris and Llamado, he concurred only in the judgment in part, and otherwise respectfully dissented.

**COUNSEL**

Christopher S. Morris (argued), Morris Law Firm APC, San Diego, California, for Plaintiffs-Appellants.

Fernando Kish (argued) and James M. Chapin, Senior Deputies; Thomas E. Montgomery, County Counsel; Office of County Counsel, San Diego, California; for Defendants-Appellees.

**OPINION**

WARDLAW, Circuit Judge:

Ronnie Sandoval died of a methamphetamine overdose at the San Diego Central Jail after medical staff left him unmonitored for eight hours, despite signs that he was under the influence of drugs, and then failed to promptly summon paramedics when they discovered him unresponsive and having a seizure. Sandoval's wife and successor-in-interest, Ana Sandoval (Plaintiff), brought suit under 42 U.S.C. § 1983 against the County of San Diego and Nurses Romeo de Guzman, Dana Harris, and Maria Llamado, alleging that they violated Sandoval's Fourteenth Amendment right to adequate medical care in custody.

The district court granted summary judgment to the defendants, concluding that there were no triable issues of fact as to their liability and that the individual nurses were entitled to qualified immunity. After the district court issued its decision, we clarified that an objective standard applies to constitutional claims of inadequate medical care brought by pretrial detainees. *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018). Applying that standard here, we reverse because genuine disputes of material fact

preclude the award of summary judgment, and we remand for further proceedings.

## I.

Many of the facts underlying this case are in dispute. We recount them in the light most favorable to Plaintiff, as the non-moving party in the district court. *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019) (per curiam).

### A.

On February 22, 2014, deputies from the San Diego Sheriff's Department went to Ronnie Sandoval's residence to conduct a probation compliance check. After the deputies found a gram of methamphetamine and drug paraphernalia, they placed Sandoval under arrest and took him to the San Diego Central Jail. Unbeknownst to the arresting deputies, Sandoval had swallowed an additional amount of methamphetamine—later estimated to be several hundred times the typical recreational dose—in an effort to prevent its discovery.

At the jail, Deputy Matthew Chavez noticed that Sandoval was sweating and appeared disoriented and lethargic. When asked about these symptoms, Sandoval told Chavez that he might be diabetic. A nurse tested Sandoval's blood sugar level, which came back normal, and Sandoval was placed in a holding cell.

Approximately one hour later, Sandoval was removed from the cell to have his booking photograph taken. Deputy Chavez observed that Sandoval "was still sweating a lot and appeared to be very tired and disoriented." Chavez asked Sandoval if he was ok. Sandoval responded that he was very cold, which Chavez found odd because Sandoval was

sweating.   Another deputy asked Sandoval if he had swallowed anything, and Sandoval became agitated and refused to answer further questions.

Deputy Chavez took Sandoval to the second-floor medical station for an assessment.  There he encountered Nurse Romeo de Guzman.  Chavez told de Guzman that while Sandoval had been cleared by the medical staff downstairs, he was sweating and appeared disoriented and lethargic.  According to Chavez, he specifically told de Guzman, "there [is] still something going on [with Sandoval], so you need to look at him more thoroughly."[1] De Guzman told Chavez to put Sandoval in Medical Observation Cell No. 1 (MOC1).

Shortly thereafter, around 5:00 p.m., de Guzman entered MOC1 to attend to Sandoval.  Leonard Rodriguez, a deputy who accompanied de Guzman into the cell, noticed that Sandoval was "shaking mildly" and "appeared to be having withdrawals from drugs."  De Guzman gave Sandoval a second, and "very quick," blood sugar test, which came back normal and then left the cell without conducting any further examination.

From there, accounts diverge.  Nurse de Guzman claims that he told deputies that Sandoval was "cleared for booking process."  But according to Deputy Rodriguez's written, contemporaneous police report, de Guzman instead asked whether Sandoval could be moved to a "sobering tank."  The deputies conferred and determined that it would be better if

---

[1] Nurse De Guzman contends that he was told only to check Sandoval's blood sugar level, but on summary judgment, we must accept Deputy Chavez's version of events.

Sandoval remained in MOC1, presumably so that he would be subject to closer observation by the medical staff.

All agree that Sandoval was not transferred and instead remained in MOC1. And it is undisputed that even though MOC1 was only 20 feet from the nursing station, Nurse de Guzman did not check on Sandoval at any point during the remaining six hours of his shift. When the next shift of nurses arrived at 11:00 p.m., de Guzman did not tell them anything about Sandoval either. When asked why he never checked on Sandoval, de Guzman responded simply, "I don't have to."

The failure to monitor Sandoval may have resulted in part from the "mixed use" nature of MOC1. While MOC1 was sometimes used to hold inmates requiring medical care, it was used at other times as an ordinary holding cell. Unlike other cells used for inmates with medical issues, no nurses were specifically assigned to monitor individuals being held in MOC1. Instead, nurses would attend to MOC1 only if told that an individual who was placed there needed care.

This sometimes caused confusion. For example, Nurse de Guzman claims that he did not check on Sandoval because he believed that MOC1 was used exclusively as an ordinary holding cell and that Sandoval was being held there for correctional, rather than medical, purposes. In contrast, the deputies believed that by leaving Sandoval in MOC1, they would ensure that he would be monitored by the medical staff.

Whatever the cause, Sandoval remained almost entirely unmonitored for nearly eight hours until Sergeant Robert Shawcroft walked past MOC1 at 12:55 a.m. and noticed that Sandoval's eyes "weren't tracking" and that his skin tone

"wasn't a fleshy color."[2]  As Shawcroft watched, Sandoval slumped over and his eyes rolled back in his head. Shawcroft turned away to call for help, and when he turned back, he saw Sandoval hit his head on the wall and slide down to the floor.

Sergeant Shawcroft entered Sandoval's cell and was soon joined by Deputies Nolan Edge and Matthew Andrade, and Nurses Dana Harris and Maria Llamado.  Sergeant Shawcroft, Deputy Andrade, Deputy Edge, and Nurse Llamado all agree that Sandoval was unresponsive and having a seizure or "seizure-like activity."  In contrast, Nurse Harris contends that Sandoval was responsive, followed verbal commands, and was not seizing.

Whether Sandoval was unresponsive and seizing bears on an important distinction in this case between emergency medical technicians (EMTs) and paramedics.  While the terms are sometimes used interchangeably, paramedics receive more advanced training than EMTs.  EMTs can provide only basic life support (BLS) procedures, such as performing CPR and providing a patient with an oxygen mask.  In contrast, paramedics are trained to perform advanced cardiovascular life support (ACLS) procedures, including establishing IVs, administering medications, reading heart rhythms, and inserting breathing tubes. Critically, when a patient is unresponsive, paramedics are required.  In San Diego at least, EMTs will not transport unresponsive patients.

---

[2] Other than one deputy who briefly checked on Sandoval around 7:30 p.m., it appears that nobody entered MOC1 between around 5:00 p.m., when Nurse de Guzman performed the blood test, and 12:55 a.m., when Sergeant Shawcroft observed Sandoval in medical distress.

Because Nurse Harris was the first nurse to arrive on the scene, she became the "team leader" with primary responsibility for directing Sandoval's treatment. The evidence shows that even though Harris was told several times to call paramedics because Sandoval was unresponsive, she refused to do so.

Deputy Andrade, who happened to be a trained EMT, asked two or three times for paramedics to be called. Harris did not do so. Nurse Llamado says that she directly told Harris, "He has to go out 9-1-1," meaning that paramedics were needed. Harris responded, "No, EMT." Llamado then telephoned the charge nurse, Shirley Bautista, who also said that paramedics should be summoned. Llamado put the phone down and told Harris, "Shirley said he has to go now 9-1-1." Despite all of this, Harris still refused to call paramedics.[3]

It is undisputed that EMTs were initially summoned instead of paramedics. When the EMTs arrived around 1:20 a.m., they informed the nurses and deputies that "they would not be able to transport Sandoval in the current condition he was in." Paramedics were then called and arrived at 1:42 a.m.—47 minutes after Sandoval was first observed to be unresponsive and seizing. According to Deputy Andrade, Sandoval still had a pulse when the paramedics arrived. But he lost his pulse when he was transferred to a gurney. Resuscitation efforts failed, and Sandoval was pronounced dead at 2:11 a.m.

---

[3] Harris denies that Deputy Andrade and Nurse Llamado told her to call paramedics, and contends that she did not believe paramedics were necessary because, in her view, Sandoval was responsive, communicative, and breathing on his own. On summary judgment, we must accept Andrade and Llamado's very different version of events.

During discovery, it was revealed that Nurse Harris did not know on the night of the incident that only paramedics, and not EMTs, could provide the ACLS treatment that Sandoval required—even though this was common knowledge among nurses.  Nurse Llamado later admitted that she should have called paramedics herself when Harris refused to do so, and that she had "learned [her] lesson."

## B.

Sandoval's wife, Ana Sandoval, filed this suit in California state court against Nurses de Guzman, Harris, and Llamado, and the County of San Diego.  The complaint alleged that the individual nurses had violated the Fourteenth Amendment by failing to provide Sandoval adequate medical care, and that the County was likewise liable because its policy of using MOC1 as a mixed used cell, without proper communication protocols, created the confusion among the medical staff that led to Sandoval's death.  The complaint also asserted several state law claims.[4]

The defendants removed the case to federal court and later moved for summary judgment.  For reasons discussed in more depth below, the district court granted summary judgment to the defendants on the constitutional claims brought under 42 U.S.C. § 1983 and declined to exercise supplemental jurisdiction over the state law claims.  Plaintiff timely appealed.

---

[4] Sandoval's children Ronnie Sandoval Jr. and Josiah Sandoval were named as additional plaintiffs on some of the state law claims, but not on the constitutional claims under § 1983.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo. "Summary judgment is appropriate when, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to judgment as a matter of law." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (citation omitted); Fed. R. Civ. P. 56(a). "Evidentiary rulings made in the context of summary judgment motions are reviewed for abuse of discretion . . . ." *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007).

## III.

Before discussing the merits, we address a significant evidentiary ruling by the district court. During briefing on the motion for summary judgment, the nurses and the County submitted boilerplate one-word objections for "relevance," "hearsay," and "foundation" to several pieces of evidence important to Plaintiff's case, including the report of Plaintiff's medical expert, the police reports of deputies at the scene, and the San Diego County Sheriff's Medical Services' standardized nursing procedures for treating seizures. The district court sustained all of these objections in a one-sentence ruling that read in full: "Defendants' evidentiary objections, to which Plaintiffs did not respond, are sustained." This decision, which had the effect of striking crucial evidence from the summary judgment record, was an abuse of discretion.

The defendants' failure to explain their one-word objections, and the district court's failure to explain its ruling, makes it difficult to know precisely why the court concluded that the evidence was inadmissible. But on the

record before us, it appears the objections were meritless, if not downright frivolous.

To begin, objections for relevance are generally unnecessary on summary judgment because they are "duplicative of the summary judgment standard itself." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (Shubb, J.).  On summary judgment, a court must determine whether the evidence viewed in the light most favorable to the non-moving party creates a "genuine dispute as to any material fact" that must be resolved at trial.  Fed. R. Civ. P. 56(a).  And under Federal Rule of Evidence 401, evidence is relevant if it "has any tendency to make a fact more or less probable" and that fact "is of consequence in determining the action."  Fed. R. Evid. 401.  Putting these two standards together, if evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition, "of consequence in determining the action," and therefore relevant.  *Id.* Conversely, if the submitted evidence does not create a genuine dispute of material fact, there is no need for the court to separately determine whether it is relevant because, even assuming it is not, it will not affect the ultimate summary judgment ruling.  We therefore agree with Judge Shubb's cogent observation that parties briefing summary judgment motions would be better served to "simply *argue*" the import of the facts reflected in the evidence rather than expending time and resources compiling laundry lists of relevance objections.  *Burch*, 433 F. Supp. 2d at 1119.

In any event, the relevance objections here plainly lacked merit.  For example, the objected-to police reports provide the deputies' first-hand observations of Sandoval's condition, and the objected-to report of Plaintiff's medical expert is essential to her ability to show that Sandoval would

not have died if not for the defendants' failure to provide adequate care.  This evidence goes to the central issues in the case and is therefore more than sufficient to clear the low bar of relevance.[5]  *See* Fed. R. Evid. 401.

We reach the same conclusion with regard to the hearsay objections.  Because the defendants did not explain these objections, we are largely reduced to guessing at the arguments underlying them.  One possibility is that the defendants objected on the ground that the documents themselves would not be admissible at trial because they are out-of-court statements offered for their truth.  *See* Fed. R. Evid. 801(c), 802.  But "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see* Fed. R. Civ. P. 56(c)(2).  If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment.  *Fraser*, 342 F.3d at 1036–37 (holding that the plaintiff's diary could be considered on

---

[5] The defendants provided an explanation for only one of their several objections, but in a twist of irony, that explanation makes clear that the objection lacked merit.  The defendants objected to the Sheriff's Department Medical Services Standardized Nursing Procedure on Seizure Disorder on the ground that "Nurse Harris determined that [Sandoval] was not having a seizure."  But whether Nurse Harris knew Sandoval was having a seizure is a hotly disputed issue in this case.  It goes without saying that a district court evaluating an objection on summary judgment cannot simply accept the *moving party's* version of disputed facts when determining which evidence is relevant.

summary judgment because she could testify consistent with its contents at trial).

Here, the objected-to documents either reflect the personal knowledge of individuals who could be called to testify at trial or will likely be admissible at trial under exceptions to the hearsay rule. For example, Plaintiff's expert witnesses can testify about the opinions expressed in their expert reports, and the deputies and medical examiner can testify about the personal observations reflected in their official reports. *See id.* To the extent the police reports recount statements made by the defendants in this case, they would be admissible as non-hearsay statements of a party opponent. *See* Fed. R. Evid. 801(d)(2). Hearsay therefore provided no basis for excluding the objected-to documents in their entirety. And to the extent the defendants intended to object to only *parts* of the documents, their unexplained generalized objections were insufficient to raise such an objection. *See* Fed. R. Evid. 103(a)(1)(B); *United States v. Holland*, 880 F.2d 1091, 1095 (9th Cir. 1989) ("Holland's blanket objection to the admission of the tape does not preserve an objection to failure to redact the tape.").

As for the foundation objections, "an objection to admission of evidence on foundational grounds must give the basis for objection in a timely way to permit the possibility of cure." *Jerden v. Amstutz*, 430 F.3d 1231, 1237 (9th Cir. 2005); *accord* 21 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5036.7 (2d ed. 2020 update). The defendants' one-word objections for "foundation" fell well short of providing Plaintiff with notice of the specific ground of objection and, consequently, what could be done to cure any defects. Accordingly, these objections also provided no basis for excluding the evidence.

In an attempt to justify the district court's evidentiary ruling, the defendants point to a local rule of the District Court for the Southern District of California that provides that the failure to file timely opposition papers "may constitute a consent to the granting of a motion or other request for ruling by the court." *See* S.D. Cal. Local Rule 7.1.f.3.c. It is not clear that this rule applies to a failure to file a written response to evidentiary objections.[6] But in any event, the district court did not mention this rule or any other in sustaining the defendants' objections, and we will not simply assume that it formed the basis for the evidentiary ruling.[7]

Because we conclude that the district court abused its discretion by summarily sustaining the defendants' meritless—indeed frivolous—evidentiary objections, we will consider that evidence.

---

[6] Southern District of California Local Rule 7.1.f.3.c provides that when a party "fails to file [opposition] papers in a manner required by Civil Local Rule 7.1.e.2," the court may grant the opposing party's request. S.D. Cal. Local Rule 7.1.f.3.c. The referenced rule—Rule 7.1.e.2, which sets the time for filing an opposition—applies only to "motion[s], application[s], or order[s] to show cause." S.D. Cal. Local Rule 7.1.e.2. It is not clear that evidentiary objections submitted in conjunction with a reply brief in support of a motion for summary judgment constitute a "motion" or "application" within the meaning of the rule. Other provisions of Local Rule 7.1 are ambiguous on this point.

[7] We therefore have no occasion to address whether applying this local rule rigidly would amount to an abuse of discretion where, as here, it would effectively prevent a plaintiff from satisfying her burden on summary judgment. *See Ghazali v. Moran*, 46 F.3d 52, 53–54 (9th Cir. 1995) (per curiam) (explaining the factors a district court must consider when applying a local rule would result in the dismissal of a case).

**IV.**

Turning to the merits, we begin with a brief history of constitutional claims based on inadequate medical care, which, for reasons that will become apparent, provides important context for understanding the issues presented by this case.

A.

Individuals in state custody have a constitutional right to adequate medical treatment. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). For inmates serving custodial sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment. *Id.* However, pretrial detainees have not yet been convicted of a crime and therefore are not subject to punishment by the state. Accordingly, their rights arise under the Fourteenth Amendment's Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520, 535–36, 335 n.16 (1979).

Claims brought by convicted prisoners under the Eighth Amendment are governed by what we have called a "subjective deliberate indifference" standard. *Gordon*, 888 F.3d at 1122; *see Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (per curiam), *cert. denied sub nom. ID DOC, ET AL. v. Edmo,* No. 19-1280, 2020 WL 6037411 (U.S. Oct. 13, 2020). Under this standard, a prison official will be liable for disregarding an inmate's serious medical needs only if he was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually "dr[e]w the inference." *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Thus, a prison official who "*should* have been aware" of a medically related risk to an inmate, but in fact was not, "has

not violated the Eighth Amendment, no matter how severe the risk." *Id.* (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

Because pretrial detainees "retain at least those constitutional rights that we have held are enjoyed by convicted prisoners," *Bell*, 441 U.S. at 545, we have sometimes looked to the Eighth Amendment as a starting point for determining the rights of pretrial detainees under the Fourteenth Amendment. *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996) ("[T]he [E]ighth [A]mendment guarantees provide a minimum standard of care for determining a prisoner's rights as a pretrial detainee, including the prisoner's rights to medical care." (emphasis removed and cleaned up)). And in the context of claims of inadequate medical care, we had previously concluded that the Eighth Amendment and Fourteenth Amendment standards were precisely the same. *See, e.g.*, *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010). That is, to succeed on a claim of inadequate medical care, both convicted prisoners and pretrial detainees were required to establish subjective deliberate indifference on the part of the defendant. *Id.*

The Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), however, cast doubt on our practice of evaluating Eighth Amendment and Fourteenth Amendment claims under the same standard. *Kingsley* involved claims that jail officials had used excessive force against a pretrial detainee. *Id.* at 391. When such claims are brought by convicted prisoners under the Eighth Amendment, liability turns on "whether force was applied in a good faith effort to maintain or restore discipline." *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (citation omitted); *see also Hoard v. Hartman*, 904 F.3d 780,

787–88 (9th Cir. 2018). The question presented in *Kingsley* was whether the Eighth Amendment subjective good faith standard also applies to Fourteenth Amendment excessive force claims brought by pretrial detainees. 576 U.S. at 391–92.

The Court held that the Eighth Amendment and Fourteenth Amendment standards were not the same. *Id.* at 400 ("The language of the two Clauses differs, and the nature of the claims often differs."). It concluded that for Fourteenth Amendment claims, the relevant question is not whether the defendant acted in good faith, but instead whether the force used was "objectively unreasonable." *Id.* at 396–97.

Recognizing that *Kingsley* called into question our practice of applying Eighth Amendment standards to other varieties of Fourteenth Amendment claims brought by pretrial detainees, we addressed the issue en banc in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). In *Castro*, a pretrial detainee alleged that prison officials had failed to protect him from violence at the hands of another inmate placed in his cell. *Id.* at 1064. We were mindful that when such failure-to-protect claims are brought by convicted prisoners under the Eighth Amendment, they are governed by a subjective deliberate indifference standard similar to the one that applies to claims of inadequate medical care. *Id.* at 1067–68.

However, in *Castro*, we concluded that while we had previously also applied the Eighth Amendment failure-to-protect standard to similar Fourteenth Amendment claims brought by pretrial detainees, we could no longer do so after *Kingsley*. *Id.* at 1069–70. We held instead that Fourteenth Amendment failure-to-protect claims should be analyzed under an objective framework, under which the critical

question is whether the defendant failed to take reasonable measures to abate a serious risk of harm to an inmate "even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Id.* at 1071.

This was the state of the law at the time the district court ruled on the summary judgment motion here. Citing *Castro*, Plaintiff argued in the district court that an objective standard should apply to her Fourteenth Amendment claim that the defendants failed to provide Sandoval with adequate medical care. But the district court concluded that *Castro*, which had specifically addressed only failure-to-protect claims, had not overruled Ninth Circuit precedent applying the Eighth Amendment subjective deliberate indifference standard to inadequate medical care claims brought by pretrial detainees. Accordingly, the district court applied that subjective standard to Plaintiff's claims and granted summary judgment in favor of the defendants.

After the district court's ruling, however, we issued our opinion in *Gordon*, which made clear that *Castro* and *Kingsley* had in fact displaced our prior precedent for claims brought by pretrial detainees alleging inadequate medical care. *Gordon*, 888 F.3d at 1124–25. In *Gordon*, we adopted an objective framework for such claims that mirrored the framework *Castro* had adopted for failure-to-protect claims. *Id.* Under that standard, pretrial detainees alleging that jail officials failed to provide constitutionally adequate medical care must show:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined

[including a decision with respect to medical treatment];

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. To satisfy the third element, the plaintiff must show that the defendant's actions were "objectively unreasonable," which requires a showing of "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro*, 833 F.3d at 1071).

In light of our holding in *Gordon*, it is clear that the district court here erred by applying the subjective deliberate indifference standard to Plaintiff's Fourteenth Amendment claim. Because the parties have briefed *Gordon*'s objective framework on appeal, we apply it here.

B.

Beginning with Nurse de Guzman, the evidence viewed in the light most favorable to Plaintiff shows that Deputy Chavez told de Guzman that Sandoval was sweating, tired, and disoriented. Deputy Chavez insisted that he told de

Guzman, "There [is] still something going on [with Sandoval] so you need to look at him more thoroughly." Despite receiving this information, de Guzman did nothing more than administer a duplicative blood sugar test—a test de Guzman admitted took only about ten seconds. Without conducting any further evaluation, de Guzman then told deputies that Sandoval was cleared for booking.

When the deputies left Sandoval in MOC1, de Guzman asked them if Sandoval could "go into a sobering tank." A jury could conclude, based on this statement, that de Guzman suspected Sandoval was under the influence of drugs or alcohol. Yet although de Guzman knew that Sandoval remained in MOC1, which was only 20 feet away from the nursing station, he failed to check on Sandoval at any point during the remaining six hours of his shift. Worse still, when his shift was over, de Guzman did not relay any information about Sandoval to the nurses who replaced him. This left the night shift nurses with no way of knowing that Sandoval was being held in MOC1 for medical reasons.

Applying the *Gordon* framework, a jury could conclude that a reasonable nurse who was told that Sandoval was shaking, tired, and disoriented—and who was specifically directed by a deputy to evaluate Sandoval "more thoroughly"—would have understood that Sandoval faced a "substantial risk of suffering serious harm." *Gordon*, 888 F.3d at 1125. Sweating and being so disoriented that officers observe and comment about it are not everyday conditions. A jury could further conclude that de Guzman's actions toward Sandoval—which were limited to administering a quick blood test and then ignoring Sandoval for the remaining six hours of his shift—were "akin to reckless disregard." *Id.* De Guzman is therefore not entitled to summary judgment on liability.

### C.

We reach the same conclusion for the claims against Nurses Harris and Llamado.

There can be no debate that a reasonable nurse would understand that an individual who is unresponsive and seizing faces a substantial risk of suffering serious harm. Thus, the question with regard to Nurses Harris and Llamado is whether a jury could find that their failure to promptly call paramedics was objectively unreasonable.

On summary judgment, we must accept the extensive evidence that all reasonable nurses would know that only paramedics, not EMTs, had the training necessary to allow them to transport patients in Sandoval's condition. This is reflected in the Sheriff's Department Medical Services Division Policy and Procedure Manual, which lists "status epilepticus"—i.e. a severe seizure—as a condition that "require[s] 911 *Paramedic* Emergency Response." And it is echoed by Deputy Andrade (a trained EMT) and Nurse Llamado, who testified that they told Nurse Harris during the incident that paramedics were needed because EMTs could not transport unresponsive patients. Indeed, Llamado later admitted that she should have called paramedics herself when Harris refused to do so. This evidence is more than sufficient to allow a jury to find that Llamado and Harris's failure to summon paramedics was objectively unreasonable. *See Gordon*, 888 F.3d at 1125.

Arguing that they are entitled to summary judgment, Nurses Harris and Llamado point to cases in which we have held that "a difference of medical opinion regarding . . . treatment" does not amount to a constitutional violation. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

These cases applied the Eighth Amendment subjective deliberate indifference standard and therefore are of limited relevance to the Fourteenth Amendment claims here. But even under the Eighth Amendment standard, a defendant can be held liable for actions that were "medically unacceptable under the circumstances." *Toguchi*, 391 F.3d at 1058 (internal quotation marks and citation omitted). Here, there is ample evidence from which a jury could conclude that promptly calling paramedics was the *only* medically acceptable option.[8]

Finally, to the extent Nurses Harris and Llamado argue that Sandoval would not have survived even if they had promptly summoned paramedics, Plaintiff's expert, Dr. Michael Falgiani, opined that it was more likely than not that Sandoval's life could have been saved if he "had been taken to an emergency department at any time during the time he was in Central Jail up to the time that he lost pulses and went into cardiac arrest." And according to Deputy Andrade, Sandoval still had a pulse when the paramedics first arrived. Crediting Dr. Falgiani's opinion, and taking Deputy Andrade's account as true, a jury could find that Sandoval would not have died but for the delay in calling paramedics.

In sum, viewing the evidence in the light most favorable to Plaintiff, there are triable issues of fact on the claims against each of the individual nurses. Accordingly, the nurses are not entitled to summary judgment on liability.

---

[8] Nurse Harris's arguments to the contrary rest in large part on her assertions that Sandoval "did not have any of the symptoms commonly associated with seizures" and that she "could not have anticipated" that EMTs would not transport Sandoval. Both of these propositions are contradicted by evidence in the record. They therefore serve only to support our view that summary judgment was inappropriate.

V.

We now turn to whether the nurses are entitled to qualified immunity.

"Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether a state official is entitled to qualified immunity in the context of summary judgment, we consider (1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a violation of a constitutional right and (2) whether that right was "clearly established at the time of the violation." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (citing *Pearson*, 555 U.S. at 232).

A.

We begin with whether the shift in the legal framework governing Plaintiff's claims—from subjective deliberate indifference to objective unreasonableness—has any bearing on the qualified immunity analysis. The nurses argue, and the dissent agrees, that in determining whether the nurses are entitled to qualified immunity, we must apply all elements of an inadequate medical care claim exactly as they stood at the time of the incident at issue here, including the subjective deliberate indifference requirement. But we have already rejected this approach in *Horton by Horton v. City of Santa Maria*. 915 F.3d at 599–603. Under *Horton*, when we assess qualified immunity for a claim of inadequate medical care of a pre-trial detainee arising out of an incident that took place prior to *Gordon*, we apply the current objective

deliberate indifference standard to analyze whether there was a constitutional violation, *id.* at 602, and "concentrate on the objective aspects of the [pre-*Gordon*] constitutional standard" to evaluate whether the law was clearly established, *id.* at 600.

To fully understand *Horton*, we must first address *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002). Jeffrey Ford was killed by his cellmate, James Diesso, who had a history of violent behavior against other prisoners. *Id.* at 1045–47. Ford's family and estate brought an Eighth Amendment deliberate indifference claim against the correctional officers who allowed Diesso to be housed with Ford. *Id.* at 1047–48. The district court concluded that genuine issues of material fact existed as to whether the officers were aware of Diesso's history of violence. *Id.* at 1048. Because our circuit had "held in *Hamilton v. Endell*, 981 F.2d 1062 (9th Cir.1992), that a finding of deliberate indifference (or of a triable issue as to it) necessarily precludes a finding of qualified immunity," *id.* at 1045, the district court denied qualified immunity, *id.* at 1048. On appeal, the *Ford* panel reversed, concluding "that *Hamilton*, which collapse[d] the deliberate indifference part of the constitutional inquiry into the qualified immunity inquiry, ha[d] been undermined by *Saucier* [*v. Katz*, 533 U.S. 194 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223]," *id.* at 1050, because the "key point" in *Saucier* "is that the qualified immunity inquiry is separate from the constitutional inquiry," *id.* at 1049.

We further explained that "the qualified immunity inquiry 'has a further dimension.'" *Id.* (quoting *Saucier*, 533 U.S. at 205). That dimension is the clearly established law inquiry, which allows "'all but the plainly incompetent or those who knowingly violate the law' [to] have immunity

from suit." *Id.* (quoting *Saucier*, 533 U.S. at 202). However, we noted that "[w]hile Eighth Amendment claims depend in part on a subjective test that does not fit easily with the qualified immunity inquiry, there is an objective component as well. To violate the Eighth Amendment, the deprivation alleged must *objectively* be sufficiently serious." *Id.* If the law at the time of an alleged violation did not clearly establish that the specific situation faced by an officer was sufficiently serious, "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high." *Id.* at 1050. Thus, the "dispositive inquiry" in the clearly-established analysis is "whether it would be clear to a reasonable officer that his *conduct* was unlawful in the situation he confronted," based on the law at the time. *Id.* (quoting *Saucier*, 533 U.S. at 202) (emphasis added).

Turning to the *Estate of Ford* facts, we concluded that "if any of the officers knew that Diesso was acting out dangerously with cellmates or that he was a threat to Ford but housed Ford with him anyway, this would violate the Eighth Amendment." *Id.* Nonetheless, the officers were entitled to qualified immunity, because no law at the time of the incident "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Id.* at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3). Therefore, "we c[ould not] say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling." *Id.*

*Horton* built upon *Estate of Ford*'s rationale. There, an officer left Horton, a pre-trial detainee, alone in his jail cell

for a prolonged period of time, despite having been warned by Horton's mother in a phone call that he was a suicide risk. *Horton*, 915 F.3d at 597–98.   After turning to some paperwork, the officer went to check on Horton and found him hanging from the cell door, unmoving.   Although Horton survived, the delay in treatment led to severe and permanent brain damage.  The law at the time of the incident was the pre-*Gordon* deliberate indifference standard.  *Id.* at 599.   Relying on *Estate of Ford*, we observed that "deliberate indifference claims [under the pre-*Gordon* standard] 'depend in part on a subjective test that does not fit easily with the qualified immunity inquiry,' which is an objective inquiry."  *Id.* (quoting *Estate of Ford*, 301 F.3d at 1050); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982) (explaining that qualified immunity examines "the objective reasonableness of an official's conduct, as measured by reference to clearly established law"). Therefore, "even where the clearly established legal standard requires [subjective] deliberate indifference, the qualified immunity inquiry should concentrate on the objective aspects of the constitutional standard."  *Horton*, 915 F.3d at 600.

Thus, the officer would enjoy qualified immunity unless Horton demonstrated that, "given the available case law at the time of his attempted suicide, a reasonable officer, knowing what [the officer] knew, would have understood that failing to check on Horton immediately after the phone call with [Horton's mother] presented such a substantial risk of harm to Horton that the failure to act was unconstitutional."  *Id.*  As in *Estate of Ford*, we concluded that the officer was entitled to qualified immunity, because "the case law at the time of Horton's attempted suicide was simply too sparse, and involved circumstances too distinct from those [of *Horton*], to establish that a reasonable officer

would perceive a substantial risk that Horton would imminently attempt suicide." *Id.* at 601–02.

After determining that the officer was entitled to qualified immunity because the law was not clearly established that the officer's failure to immediately act upon the suicide warning violated the constitutional right to adequate medical care, it was unnecessary for us to reach the question whether a constitutional violation had actually occurred, and we declined to do so. *Id.* at 602. However, we explicitly recognized that were we required to address whether the officer's conduct violated the constitution, the *Gordon* objective standard would "guide our analysis of whether a constitutional violation occurred." *Id.* This was because in *Gordon* we had "recently recognized that *Castro*'s objective deliberate indifference standard extends to Fourteenth Amendment claims by pretrial detainees for violations of the right to adequate medical care." *Id.*

The rule of *Horton*, aside from the fact that it is controlling precedent, makes sense. The purpose of determining whether there has been a constitutional violation has always been to "further the development of constitutional precedent." *Pearson*, 555 U.S. 237; *see also Saucier*, 533 U.S. at 201. It would run counter to that goal to apply the pre-*Gordon* standard now, because "no purpose would be served for future cases from delineating the application of that standard to the constitutional merits of this case." *Horton*, 915 F.3d at 602.[9]

---

[9] The dissent misreads *Horton* to conclude that the subjective element of the pre-*Gordon* standard governs the analysis of whether the nurses violated Sandoval's clearly established constitutional right to adequate medical care. Dissent at 58–59. In *Horton*, we simply

Horton's recognition that the objective deliberate indifference standard applies even when the incident occurred pre-*Gordon* comports with the purpose underlying the clearly established law requirement. As the Supreme Court has explained, this requirement is designed to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "[T]he focus is on whether the [defendant] had fair notice that her conduct was unlawful . . . ." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Thus, as the Supreme Court has often repeated, the defense of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Because the premise of qualified immunity is that state officials should not be held liable for money damages absent fair warning that their actions were unconstitutional, the clearly established law standard "requires that the legal principle clearly prohibit the [defendant's] conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). This inquiry is an objective one that compares the factual circumstances faced by the defendant to the factual circumstances of prior cases to determine whether the decisions in the earlier cases would

---

observed that there was no purpose in analyzing the issue of whether, applying the *Gordon* objective deliberate indifference standard, there was a constitutional violation, as the *Horton* court had already determined that the law as to the need for immediate care of a potential suicide victim was not clearly established, and thus the officers were entitled to qualified immunity in any event. 915 F.3d at 602.

have made clear to the defendant that his conduct violated the law. *See e.g.*, *Abbasi*, 137 S. Ct. at 1866 ("Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts." (citation omitted)); *Harlow*, 457 U.S. at 819 (qualified immunity "turn[s] primarily on objective factors"). The focus is on the standards governing the defendant's conduct, not legal arcana. *See Saucier*, 533 U.S. at 202–03 (if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard").

Consistent with this purpose, the qualified immunity analysis remains objective even when the constitutional claim at issue involves subjective elements. *Crawford-El v. Britton*, 523 U.S. 574, 588–89 (1998) ("[A]lthough evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case."). Thus, in the Eighth Amendment deliberate indifference context, we have recognized that "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity." *Estate of Ford*, 301 F.3d at 1050. We are not aware of a single case in which we have examined the defendant's mental state in assessing the clearly established law prong of qualified immunity.

Several other circuits have concluded, as we did in *Horton*, that because the clearly established law prong

focuses objectively on whether it would be clear that the defendant's conduct violated the Constitution, lack of notice regarding the mental state required to establish liability has no bearing on the analysis.

Take, for example, the Seventh Circuit's decision on remand from the Supreme Court in *Kingsley* itself. *See Kingsley v. Hendrickson*, 801 F.3d 828 (7th Cir. 2015) (per curiam) ("*Kingsley II*"). At the trial that took place before the case reached the Supreme Court, the district court's instructions on the excessive force claims "suggested the jury should weigh [the defendants'] subjective reasons for using force and subjective views about the excessiveness of the force." *Kingsley*, 576 U.S. at 403–04. Under that standard, the jury found in the defendants' favor. *Id.* at 394. The Supreme Court later concluded, however, that the standard should have been objective unreasonableness. *Id.* at 392. On remand, the *Kingsley* defendants advanced a view of qualified immunity similar to the one the nurses offer here. They argued that because the Supreme Court's decision had "altered the substantive law of liability," their liability should not be assessed under the new objective unreasonableness standard, which had not been clearly established at the time of the incident in the case. *Kingsley II*, 801 F.3d at 831.

In addressing this argument, the Seventh Circuit first concluded that prior cases had clearly established that the force used by the officers was excessive—i.e., that their *conduct* was unlawful. *Id.* at 832. It then turned to the defendants' argument that they were nevertheless entitled to qualified immunity because the standard had changed from subjective awareness to objective unreasonableness during the course of the litigation. *Id.* 832–33. Rejecting this position, the Seventh Circuit explained that it "would

untether the qualified immunity defense from its moorings of protecting those acting in reliance on a standard that is later determined to be infirm." *Id.* at 832. Reliance interests were not implicated there, it said, because before and after the Supreme Court's decision, "the standards for the amount of force that c[ould] be permissibly employed remain[ed] the same." *Id.* The Seventh Circuit concluded that to decide otherwise would require it "to accept the dubious proposition that, at the time the officers acted, they were on notice only that they could not have a reckless or malicious intent and that, as long as they acted without such an intent, they could apply any degree of force they chose." *Id.* at 833. It declined to do so. *Id.*

Like the Seventh Circuit, the Sixth Circuit has rejected the argument that defendants facing claims of excessive force based on pre-*Kingsley* conduct are entitled to qualified immunity simply because it would not have been clear at the time of their unconstitutional conduct that any claims against them would be governed by an objective standard. *Hopper v. Plummer*, 887 F.3d 744, 755–56 (6th Cir. 2018). As the court there explained, "a defendant is not entitled to qualified immunity simply because the courts have not agreed upon the precise formulation of the applicable standard. Rather, the relevant question under the clearly established prong is whether defendants had notice that their *conduct* was unlawful in the situation they confronted." *Id.* (emphasis added, internal citations omitted, and cleaned up). The First and Fifth Circuits have reached similar conclusions. *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 72–73 (1st Cir. 2016) (Ninth Circuit Judge Hawkins, sitting by designation) (holding that despite uncertainty about the governing legal standard, the defendants were not entitled to qualified immunity because "a reasonable officer would have known that using force in the way that the officers here

appear to have done in the particular factual circumstances that they encountered violated [the plaintiff's] constitutional rights"); *Dyer v. Houston*, 964 F.3d 374, 384 (5th Cir. 2020) (concluding that confusion in the case law about whether subjective intent was required to prove an inadequate medical care claim did not mean the defendants were per se entitled to qualified immunity, and that "the district court was still required to analyze whether the [defendants'] alleged conduct contravened clearly established law").

Rather than sticking to our settled approach, the dissent would, for the first time, drag a subjective element into the question of whether a defendant violated clearly established law. For example, the dissent concludes Nurse de Guzman is entitled to qualified immunity—regardless of whether it would have been clear to every reasonable nurse that his conduct was unlawful—because there is, supposedly, insufficient evidence that de Guzman subjectively understood that Sandoval faced a serious medical need.[10] Dissent at 65–68.

This radical reimagination of qualified immunity would produce results directly contrary to the purposes served by the doctrine—giving "government officials breathing room to make reasonable but mistaken judgments about open legal questions," *al-Kidd*, 563 U.S. at 743, while at the same time ensuring that a plaintiff can recover damages from a defendant who acts so unreasonably in light of established case law that he is appropriately described as "plainly incompetent," *Abbasi*, 137 S. Ct. at 1867. Consider how the dissent's approach would play out in practice. Here, there is

---

[10] As discussed below, *infra* note 16, this conclusion is incorrect even on its own terms, viewing the facts in the light most favorable to plaintiff, as we must on summary judgment.

no dispute that the objective unreasonableness standard from *Gordon* governs the merits of Plaintiff's claims.  Thus, had the nurses not raised a qualified immunity defense, presumably even the dissent would agree that objective unreasonableness alone would be sufficient to establish their liability.[11]  Yet the dissent would use qualified immunity, a defense designed "to shield officials . . . when they perform their duties *reasonably*," *Pearson*, 555 U.S. at 231 (emphasis added), to require Plaintiff to satisfy a standard under which the nurses would be protected from liability—no matter how *un*reasonable their conduct—as long as they did not *subjectively appreciate* that their actions put Sandoval at a substantial risk of suffering serious harm.  We cannot accept this extraordinary proposition, which would transform a defense that protects "all but the plainly incompetent," into one that provides immunity to defendants *precisely because* they were so incompetent that they did not understand the patent unreasonableness of their conduct as already established by law.[12]    *See Abbasi*, 137 S. Ct. at 1867

---

[11] Or, perhaps not.  It is not clear the dissent appreciates that the affirmative defense of qualified immunity is distinct from the merits of the plaintiff's constitutional claim.  *See Estate of Ford*, 301 F.3d at 1049.  While the plaintiff's claim may have subjective elements, as inadequate medical care claims did before *Gordon*,  the clearly established law inquiry is always an objective one that looks to whether it would have been clear to a reasonable person in the defendant's position that his conduct was unlawful.  *Horton*, 915 F.3d at 600.  Here, the subjective aspect of Plaintiff's claim for relief changed during the course of this litigation.  The objective nature of the qualified immunity defense did not.

[12] As support for its position, the dissent cites only our unpublished memorandum disposition in *Acosta v. Hill*, 244 F. App'x 792 (9th Cir. 2007).  Dissent at 54.  Putting aside that *Acosta* is not binding precedent, it also has nothing to do with the issues in this case.  *Acosta* involved a change in the law governing what constituted "deadly force."  *Id.* at 794;

(explaining that a defendant can be either plainly incompetent or entitled to qualified immunity, but not, as the dissent would have it, both at the same time).

The dissent's position might be justified if we could somehow conclude that the nurses relied on the subjective deliberate indifference standard in determining how to treat Sandoval.  But to speak the thought is to recognize that it makes little sense.  As the clearly established law prong of qualified immunity is typically applied, we impute to the defendant knowledge of the relevant case law governing his conduct.  Thus, if there is binding precedent holding that a police officer may not use deadly force against an unarmed fleeing suspect,[13] future officers are expected to tailor their conduct accordingly.  Those who fail to do so are not entitled

---

*see Smith v. City of Hemet*, 394 F.3d 689, 705–07 (9th Cir. 2005) (en banc).  Given constitutional restrictions on when a police officer may use deadly force, the change in the definition of deadly force necessarily affected when officers could justifiably use certain types of force.  In other words, as the decision itself makes clear, *Acosta* involved a change in the law governing the defendants' *conduct*.  244 F. App'x at 794 ("Under qualified immunity, the officers didn't have 'fair warning' that their actions may have been unconstitutional.").  *Acosta* therefore stands for nothing more than the well-settled rule that clearly established law must provide the defendant with notice that his conduct was unlawful in the situation he confronted—exactly the standard we apply in this case.  It provides no support for the dissent's far more reaching assertion: even if prior case law made clear that the nurses' response to Sandoval's condition was constitutionally inadequate—*even if there were a precedential case finding a constitutional violation on exactly the same facts*—the nurses would still be entitled to qualified immunity as long as they did not subjectively understand that their actions were unlawful.

[13] *See Tennessee v. Garner*, 471 U.S. 1 (1985).

to qualified immunity.[14]   They have received their "fair notice" and squandered it.  *Hughes*, 138 S. Ct. at 1152.

But how would an official who believes any claims against him would be tried under a subjective deliberate indifference standard act any differently than one who knows that an objective unreasonableness standard applies?  It is not as if an individual can consciously control the extent to which he is subjectively aware of the wrongfulness of his conduct.  It therefore seems likely that officials responsible for providing medical care to inmates will act in exactly the same manner after *Gordon* as they did before.  They will provide the treatment they think necessary under the circumstances, mindful of what our cases dictate is appropriate conduct in different factual scenarios, and, in the event they subjectively believe the treatment they are providing is inadequate, they will, we would hope, adjust their conduct accordingly.

It is true that after *Gordon*, state officials may now be held liable for providing inadequate medical care even when they were not subjectively aware of the unreasonableness of their conduct.  But as the Seventh Circuit has explained, this change could affect an official's on-the-ground actions only if we were to assume that before *Gordon*, officials acted in reliance on the belief that as long as they were not subjectively aware that their conduct created a substantial risk of serious harm to an inmate, they could provide any level of medical care they so chose, no matter how obviously deficient.  *Kingsley II*, 801 F.3d at 832–33.  Like the Sixth

---

[14] *E.g.*, *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016).

and Seventh Circuits, we refuse to accept this "dubious proposition." *Id.*; *Hopper*, 887 F.3d at 755.[15]

In sum, as we previously concluded in *Horton*, when the governing law has changed since the time of the incident, we apply the current law to determine if a constitutional violation took place under the first prong of qualified immunity analysis, and the second prong remains what it has always been: an objective examination of whether established case law would make clear to every reasonable official that the defendant's *conduct* was unlawful in the situation he confronted. *Horton*, 915 F.3d at 600–602. We will approach our analysis accordingly.

We have already determined that there is a triable issue of fact whether the nurses committed constitutional violations under the *Gordon* standard, which governs the violation prong of our qualified immunity analysis. *See id.* at 602. We turn now to whether the right was clearly established at the time.

---

[15] We recognize that three circuits appear to have concluded after *Kingsley* that they were required to apply a subjective framework for purposes of qualified immunity, even though it had since been replaced by an objective standard. *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022 (10th Cir. 2020); *Kedra v. Schroeter*, 876 F.3d 424, 440 (3d Cir. 2017); *Hall v. Ramsey County*, 801 F.3d 912, 917 n.3 (8th Cir. 2015). But in their cursory discussions of the issue, none of these courts appear to have contemplated that the clearly established law analysis may apply differently when a post-incident change in law concerns the mental state required to prove a claim rather than the lawfulness of the defendants' conduct. Nor do they explain why applying a since-abrogated subjective standard would be consistent with the purpose of qualified immunity: providing defendants with "fair notice that [their] conduct was unlawful." *Hughes*, 138 S. Ct. at 1152. We are therefore not persuaded by their analyses.

B.

Applying *Horton*'s approach here, to defeat qualified immunity for the Officers, Plaintiff must show that, given the available case law at the time, a reasonable nurse, knowing what Llamado, Harris, and de Guzman knew, would have understood that failing to call paramedics (Llamdo and Harris), or failing to check on Sandoval for hours and failing to pass on information about his condition (de Guzman), "presented such a substantial risk of harm to [Sandoval] that the failure to act was unconstitutional." *Horton*, 915 F.3d at 600. The nurses' actual subjective appreciation of the risk is not an element of the established-law inquiry. We conclude that Sandoval has demonstrated that the available law was clearly established as to the unreasonableness of the nurses' conduct.

Beginning with Nurses Harris and Llamado, it has long been established that "failing to provide . . . life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013). In *Lemire*, we held that officers who discovered an inmate unconscious after a suicide attempt could be liable when they failed to immediately begin performing CPR or any other "life saving action[s]" on the inmate and instead waited several minutes for medical professionals to arrive. *Id.* at 1083.

The case for deliberate indifference is at least as strong here. Viewing the evidence in the light most favorable to Plaintiff, Nurses Llamado and Harris, trained medical professionals, knew that Sandoval was unresponsive and seizing but failed to promptly summon paramedics. Calling paramedics was "[s]tandard nursing protocol" for prolonged seizures, and every reasonable nurse would have understood

that paramedics were the only individuals capable of transporting Sandoval to the hospital. Because every reasonable nurse, knowing what Llamado and Harris knew, would have understood that not calling paramedics amounted to an unconstitutional failure to provide "life-saving measures to an inmate in obvious need," *id.* at 1082, Harris and Llamado are not entitled to qualified immunity, *see Horton*, 915 F.3d at 600.

We reach the same conclusion with regard to Nurse de Guzman. As we have previously explained, a reasonable nurse in de Guzman's position—i.e., a nurse who was told that Sandoval was sweating, tired, and disoriented, and that "there was still something going on" that needed to be "look[ed] at . . . more thoroughly"—would understand that Sandoval faced a substantial risk of serious harm. The question thus becomes whether every reasonable nurse would understand, in light of established case law, that de Guzman violated Sandoval's constitutional right to adequate medical care when he responded by merely performing a 10-second blood sugar test—a test performed earlier to no avail—and then walking away, leaving Sandoval unattended for six hours despite the fact that he was only 20 feet from de Guzman's nursing station. In light of our precedent, all reasonable nurses would understand that de Guzman's minimal—almost non-existent—course of treatment violated the Constitution.

Our cases make clear that prison officials violate the Constitution when they "deny, delay or intentionally interfere" with needed medical treatment. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). The same is true when prison officials choose a course of treatment that is "medically unacceptable under the circumstances." *Snow v. McDaniel*, 681 F.3d 978, 988 (9th

Cir. 2012) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)), *overruled on other grounds by Peralta*, 744 F.3d 1076.

We have applied this standard on several occasions. In *Clement v. Gomez*, we held that correctional officers could be liable for failing to provide constitutionally adequate medical care when they knew that inmates had been exposed to pepper spray but waited four hours before allowing them to leave their cells to shower. 298 F.3d 898, 902, 904–05 (9th Cir. 2002). Similarly, in *Jett v. Penner*, we held that a doctor could be held liable for a constitutional violation when he knew that an inmate's thumb was fractured but failed to ensure that the fracture was set and cast. 439 F.3d at 1097–98; *see also Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (plaintiff could establish a constitutional violation when prison officials were aware that he was suffering from bleeding gums and broken teeth as a result of broken dentures but "failed to take any action to relieve his pain or to prescribe a soft food diet until new dentures could be fitted"). The rule reflected in these decisions is clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition.

To be sure, we have never before addressed the specific factual circumstances here, where a nurse is told that a patient is sweating, disoriented, and in need of a more thorough look but does nothing more than perform a quick 10-second blood test. But de Guzman is not entitled to qualified immunity simply because "the very action in question has [not] previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). State "'[o]fficials can

still be on notice that their conduct violates established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." *Wilk*, 956 F.3d at 1148 (quoting *Hope*, 536 U.S. at 741); *cf. Castro*, 833 F.3d at 1067 ("The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated Castro's right.").

If it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, *Clement*, 298 F.3d at 905, or to fail to promptly set a fractured thumb, *Jett*, 439 F.3d at 1097–98—neither of which are potentially life-threatening conditions—the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated. Accordingly, every reasonable nurse in Nurse de Guzman's position would have understood that his treatment of Sandoval, or lack thereof, was constitutionally inadequate. [16]

---

[16] Even under the dissent's subjective standard, Nurse de Guzman would not be entitled to qualified immunity because a jury could conclude from his suggestion that Sandoval be moved to a sobering tank, where individuals under the influence of drugs or alcohol are placed for observation by medical staff, that de Guzman himself *subjectively* understood that Sandoval had a serious condition requiring medical treatment. The dissent reaches a contrary conclusion only by adopting a view of the evidence that not even Nurse de Guzman has advanced. It interprets de Guzman's recommendation that Sandoval be moved to a sobering tank to *negate* any inference that de Guzman understood the seriousness of Sandoval's condition, ostensibly because de Guzman knew that inmates in a sobering cell would be checked only every four hours. Dissent at 67–68. Perhaps a jury could come to this conclusion, if de Guzman were to actually argue it. But it is not the *only* reasonable

We emphasize that this is not a case where a nurse mistakenly misdiagnosed a patient after reasonably attempting to ascertain the cause of unexplained symptoms. Instead, viewing the evidence in the light most favorable to Plaintiff, Nurse de Guzman made essentially no effort to determine why Sandoval was suffering the symptoms reported by Deputy Chavez, nor did he attempt to treat those symptoms. He then abandoned Sandoval for the remaining six hours of his shift and failed to pass along any information to the nurses who relieved him. On these facts, de Guzman is not entitled to qualified immunity. Of course, it remains to be determined at trial whether the nurses violated Sandoval's clearly established rights. Thus, summary judgment on qualified immunity should not have been awarded to defendant nurses.

## VI.

Having determined that the individual nurse defendants are not entitled to summary judgment, we now turn to the claims against the County. Under *Monell v. Department of Social Services*, the County can be liable under § 1983 if its "policy or custom" caused Sandoval's injuries through deliberate indifference to his constitutional right to adequate

---

inference that could be drawn from de Guzman's sobering tank comment. For example, a jury could find that de Guzman attempted to send Sandoval to a sobering cell, where another nurse would be responsible for his care, precisely *because* he understood that Sandoval required treatment and did not want to deal with the hassle of providing it. Because de Guzman's statement is susceptible of interpretations under which he would not be entitled to qualified immunity, it cannot be used to justify a grant of summary judgment. *Tuumalemalo*, 946 F.3d at 478.

medical care. 436 U.S. 658, 694 (1978); *see also Castro*, 833 F.3d at 1073.

The practice or custom at issue here is the County's use of MOC1 as a "mixed use" cell—sometimes used to hold inmates requiring medical care and other times used as a general holding cell—without adequate safeguards in place to ensure that jail staff were made aware when an individual was placed in MOC1 for medical, rather than correctional, reasons. According to Nurse Llamado, unlike with other medical cells at the jail (so-called sobering or safety cells), there was "no standing obligation . . . for a nurse to routinely monitor somebody in [MOC1]." Instead, a nurse would attend to MOC1 only when told by a deputy or another nurse that an inmate there required treatment.

Crucially, this system depended entirely on verbal communication. Unless directly told otherwise, nurses assumed that individuals in MOC1 were being held there for non-medical purposes. And even when deputies verbally passed off responsibility for the cell to one shift of nurses, the relief shift had no way of knowing whether to monitor MOC1 unless specifically told to do so by the nurses they were replacing. Unlike with the jail's sobering and safety cells, there were no written nursing logs for MOC1. And though the nursing unit had a whiteboard listing the names of inmates in the sobering and safety cells, the board had no space to list inmates being held in MOC1. These practices created a substantial risk of turning MOC1 into a veritable no man's land, where deputies believed the cell was being monitored by nurses, and nurses believed it was being monitored by deputies.

Nurses at the jail explained that the informal verbal pass-off system for MOC1 created confusion. The facts of this case bear that out. The deputies believed that Nurse de

Guzman knew that Sandoval was in MOC1 because he required monitoring by the medical staff.  In contrast, Nurse de Guzman was adamant that because he had ostensibly cleared Sandoval for booking, Sandoval must have been left in MOC1 for correctional purposes.  As a result, de Guzman did not inform the night shift nurses that Sandoval required care.  This evidence is sufficient to allow a jury to find that the County had an established practice of using MOC1 as a mixed-use cell without the safeguards necessary to ensure that the jail's medical staff knew when an inmate held there required medical treatment or observation.

The next question is whether there is a "direct causal link" between the County's practice with regard to MOC1 and Sandoval's injuries.  *Castro*, 833 F.3d at 1075 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).  As Nurses de Guzman and Llamado acknowledged, inmates in other medical cells were checked at least once every four hours.  A jury could infer that Sandoval would have received similar monitoring had the County put in place measures to ensure the nursing staff knew when an inmate was placed in MOC1 for medical reasons.  Moreover, had the nursing staff maintained written logs for patients held in MOC1, as they did for other medical cells, the incoming night shift nurses might have learned of Sandoval's condition from those logs and monitored him more closely.  A jury could find that had Sandoval been monitored by the nursing staff—instead of being abandoned for nearly eight hours—his deteriorating medical condition would have been discovered earlier.  And Plaintiff's expert, Dr. Falgiani, opined that Sandoval likely would have survived the overdose if he had been taken to the hospital at any time before he went into cardiac arrest.  This is sufficient to create a genuine dispute of material fact as to whether the County's practices caused Sandoval's death.

Finally, we address whether the evidence would support a finding of objective deliberate indifference on the part of the County. *Id.* at 1076. This requires a showing that the facts available to the County put it on "actual or constructive notice" that its practices with regard to MOC1 were "substantially certain to result in the violation of the constitutional rights of [its] citizens."[17]  *Id.* (emphasis removed) (quoting *Harris*, 489 U.S. at 396 (O'Connor, J., concurring)).

In granting summary judgment to the County, the district court concluded that Plaintiff could not establish deliberate indifference because there was no evidence that the failure to implement adequate communication safeguards had caused "prior injury or death to MOC1 inhabitants." The County does not defend this rationale on appeal, and for good reason. To establish her claim, Plaintiff must show that the County had actual or constructive knowledge that its practices were substantially certain to cause a constitutional

---

[17] This deliberate indifference standard does not apply when a *Monell* defendant's policies, customs, or practices directly require unconstitutional conduct—for example, "a city's policy of discriminating against pregnant women in violation of the Fourteenth Amendment." *Gibson*, 290 F.3d at 1185–86, *overruled on other grounds by Castro*, 833 F.3d 1060. Plaintiff suggests that the County had a direct policy requiring the medical staff to "ignore the inmates in [MOC1] unless told otherwise." But there is no evidence that the County *wanted* nurses to ignore all inmates in MOC1, even those suffering from medical problems. To the contrary, the evidence shows that nurses understood they were supposed to monitor MOC1 when it was being used to hold inmates requiring medical care. That Sandoval was ignored for almost eight hours was not the purpose of the County's policies but rather a tragic consequence of its failure to implement measures necessary to ensure the nursing staff knew when an individual was being held in MOC1 for medical reasons. Deliberate indifference is therefore the appropriate standard.

violation. *Id.* This standard does not require proof of a prior injury. A constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur. Otherwise, every *Monell* defendant would get "one free . . . pass" for policies or practices that are substantially certain to violate an individual's constitutional rights. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (cleaned up).

Under the proper standard, it is a close question whether Plaintiff has mustered sufficient evidence to create a triable issue of fact on whether the County was deliberately indifferent. There is certainly enough evidence to support a finding of negligence. But to establish deliberate indifference, Plaintiff must prove that the County had actual or constructive knowledge that the failure to implement protocols necessary to ensure that nurses knew when inmates in MOC1 required medical care was "substantially certain" to result in inmates failing to receive the proper treatment, creating a likelihood of serious injury or death. *Castro*, 833 F.3d at 1076.

Ultimately, we conclude that summary judgment should not have been granted on the County's liability under *Monell*. Plaintiff has put forward sufficient circumstantial evidence of the County's knowledge such that a reasonable jury could find deliberate indifference.

To begin, a jury could infer from the more rigorous policies the County put in place for the sobering and safety cells that it was aware of the importance of ensuring that the nursing staff knew which inmates required medical treatment or observation. For the sobering and safety cells, the medical staff listed the name and location of each patient on a whiteboard. Specific nurses were assigned to monitor each cell. And nurses filled out written logs with their

observations of the inmates held in those cells. A reasonable jury could conclude that the County implemented these practices because it understood they were necessary to ensure that inmates requiring medical care would not fall through the cracks. *Cf. id.* at 1077 (explaining that a county's knowledge can be inferred from its ordinances).

This conclusion is only reinforced by the fact that, after Sandoval's death, the County put in place a new practice for MOC1. Now, when a deputy places an inmate requiring medical care in MOC1, he must place a magnetic placard on the door indicating that the inmate is there for medical reasons. A jury could view this as an acknowledgement by the County that its prior practices—which relied exclusively on verbal communication—were insufficient.[18] And, as explained, it could be reasonably inferred from the fact that the County *had* implemented more extensive tracking measures for the sobering and safety cells that it knew at the time that relying on verbal communications alone would create a substantial risk that an inmate's serious medical needs could go unaddressed.

That is not to say that a jury is required to find deliberate indifference on the record before us. Perhaps the County could show at trial that there were good reasons for treating MOC1 differently from the other medical cells, and that despite the policies put in place for the sobering and safety cells, it was not aware that similar practices were required to

---

[18] To the extent the dissent suggests that evidence of the County's change in policy would be inadmissible as a subsequent remedial measure under Federal Rule of Evidence 407, Dissent at 73, the County forfeited this objection by failing to raise it in the district court. *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1094 (9th Cir. 1990) ("[F]ailure to object to allegedly defective evidence waives the objection for purposes of summary judgment[.]").

provide adequate medical care in MOC1. But viewing the evidence in the light most favorable to Plaintiff, we conclude that there is a triable issue of fact as to the County's liability under *Monell*.

* * *

Viewing the evidence in Plaintiff's favor, a jury could conclude that Ronnie Sandoval would not have died but for the defendants' unreasonable response to his obvious signs of medical distress. The district court therefore erred in granting summary judgment. We reverse and remand for further proceedings consistent with this opinion.

**REVERSED.**

COLLINS, Circuit Judge, concurring in the judgment in part and dissenting in part:

Plaintiff Ana Sandoval ("Plaintiff") brought this action under 42 U.S.C. § 1983 as the successor in interest to Ronnie Sandoval ("Sandoval"), who tragically died in custody at the San Diego Central Jail.[1] During a probation search of his residence, Sandoval surreptitiously swallowed some methamphetamine in an apparent effort to avoid its detection. After he was taken into custody for possession of drugs and drug paraphernalia that were nonetheless found during the search, the medical staff at the jail subsequently

---

[1] Ana Sandoval and her children also assert additional state-law claims on their own behalf, but the district court remanded those claims to state court after dismissing the § 1983 claims. Ana Sandoval, as successor in interest to Ronnie Sandoval, is the sole plaintiff in the § 1983 claims asserted in the operative complaint.

failed to detect that Sandoval had overdosed and that he was lying when he said that he was not under the influence. Compounding these problems, when Sandoval ultimately collapsed in his cell, there was a delay in summoning the paramedics needed to address his dire condition. Alleging that the jail employees violated Sandoval's constitutional rights through deliberate indifference to his medical needs, Plaintiff asserted claims under § 1983 against three of the jail's nurses and against the county as operator of the jail. The district court subsequently granted summary judgment to all Defendants, and Plaintiff appeals the dismissal of the § 1983 claims.

I agree with the majority's ultimate conclusion that Nurses Dana Harris and Maria Llamado were not entitled to summary judgment, but I would affirm the district court's grant of summary judgment to Nurse Romeo de Guzman and to the County of San Diego. Because my reasoning differs from the majority's even with respect to Harris and Llamado, I concur only in the judgment in part, and I otherwise respectfully dissent.

# I

Before turning to the merits, I must first briefly respond to the majority's unsolicited essay on the district court's evidentiary rulings. The district court held that, by failing to respond to Defendants' evidentiary objections to the evidence Plaintiff had submitted in opposition to Defendants' summary judgment motion, Plaintiff forfeited any challenge to those evidentiary objections, which the court therefore sustained. In her opening brief in this court, Plaintiff challenged the district court's evidentiary ruling with respect to only *one* item of evidence that she had submitted—*viz.*, the report prepared by one of the police officers in this matter. As I explain below, I agree with

Plaintiff that this document was admissible and that the district court erred in concluding otherwise. *See infra* at 65 n.4. That observation suffices to dispose of the evidentiary issues raised in the parties' briefs in this court, and we should have stopped there.

Nonetheless, the majority gratuitously proceeds to engage in a lengthy lecture about the perceived inadequacy of the Defendants' evidentiary objections below and of the district court's ruling on them. *See* Maj. Opin. at 12–16. But given that no party asked us in the merits briefs to review any other evidentiary issue, the majority should not have raised this panoply of additional issues *sua sponte*. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation," under which "'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" (citation omitted)); *Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our circuit has repeatedly admonished that we cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief." (citation omitted)).

## II

The district court granted summary judgment to the three individual Defendants (the "Nurses"), concluding that Plaintiff had failed to establish the requisite deliberate indifference and that, in any event, the Nurses were entitled to qualified immunity. In reversing the judgment as to the Nurses, the majority applies the wrong legal standards to the qualified immunity inquiry and, as to Nurse de Guzman, reaches the wrong result.

## A

In opposing the Nurses' claim of qualified immunity, Plaintiff had to show that the Nurses violated clearly established law as it stood in 2014, when they acted. Because the then-controlling deliberate-indifference liability standards included a *subjective* element, Plaintiff therefore had to make a showing of subjective deliberate indifference to defeat qualified immunity, and she had to do so even though that subjective element of the test for liability has since been overruled. The majority errs—and expressly creates a circuit split—in reaching the oxymoronic conclusion that a county employee who did not even violate the law at the time he or she acted can nonetheless be said to have violated *clearly established* law at that time.

## 1

Jail employees are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Whether an employee's conduct violated clearly established law must be "'judged against the backdrop of the law at the time of the conduct.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Changes in the applicable law that occur *subsequent* to the employee's actions are "therefore 'of no use in the clearly established inquiry.'" *Id.* at 1154 (quoting *Brosseau*, 543 U.S. at 200 n.4). Because the conduct here occurred in 2014, "the law at that time must be our guide." *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc).

Current Ninth Circuit law holds that, in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), a pretrial detainee's claim of deliberate indifference to serious medical needs "must be evaluated under an *objective* deliberate indifference standard," *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (emphasis added). But at the time the Nurses acted in this case—*i.e.*, 2014, before the decision in *Kingsley*—the then-established Ninth Circuit law provided that the same "deliberate indifference" standard that applies to Eighth Amendment medical care claims asserted by convicted prisoners also "applie[d] to claims that correction facility officials failed to address the medical needs of pretrial detainees" in violation of the Fourteenth Amendment. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010), *overruled by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).[2] Under this standard, a detainee had to show both a "serious medical need" and the defendant's "deliberate indifference" to that need. *Conn v. City of Reno*, 591 F.3d 1081, 1095–96 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011). To establish the requisite deliberate indifference, a detainee had to "show

---

[2] In *Castro*, we expressly "overrule[d] *Clouthier* to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's *subjective intent* to punish in the context of a pretrial detainee's *failure-to-protect claim*." 833 F.3d at 1070 (emphasis added). We instead held that a pretrial detainee's "due process claim for failure to protect" is governed by a purely objective test. *Id.* at 1071. In *Gordon*, we extended *Castro*'s reasoning to "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment,'" and held that such claims "must be evaluated under an objective deliberate indifference standard." 888 F.3d at 1124–25 (quoting *Castro*, 833 F.3d at 1070).

that the [jail employees] were (a) *subjectively aware* of the serious medical need and (b) failed to adequately respond." 591 F.3d at 1096.  In turn, in order for a jail employee to be found to have such subjective awareness, the employee "'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Because the qualified immunity issue turns on whether "'any reasonable official in the defendant's shoes would have understood that he [or she] was violating'" *then-existing* law, *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)), and because then-existing law required subjective awareness of a serious medical need, *Conn*, 591 F.3d at 1096, it follows that a nurse who, at the time, did not *subjectively* apprehend Sandoval's serious medical needs is entitled to qualified immunity.  Put simply, a nurse who did not violate then-existing law cannot possibly be said to have violated clearly established law, and such a nurse is therefore entitled to qualified immunity. Consequently, unless Plaintiff presented sufficient evidence to raise a triable issue with respect to (*inter alia*) a given nurse's subjective awareness of Sandoval's serious medical needs, that nurse would be entitled to qualified immunity. *See*, *e.g.*, *Acosta v. Hill*, 244 F. App'x 792, 794 (9th Cir. 2007) (where "standard for deadly force" changed by virtue of intervening en banc decision, qualified immunity was still analyzed under the *previously* applicable standard) (applying *Vera Cruz v. City of Escondido*, 139 F.3d 659, 660 (9th Cir. 1997), *overruled by Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (en banc)).

**2**

The majority nonetheless contends that the qualified immunity inquiry in this case is governed by a purely *objective* standard, *viz.*, whether "a reasonable nurse, knowing what Llamado, Harris, and de Guzman knew, would have understood that [his or her actions] 'presented such a substantial risk of harm to [Sandoval] that the failure to act was unconstitutional.'"  Maj. Opin. at 39 (citation omitted).  According to the majority, the qualified immunity inquiry requires an *exclusively* objective focus that effectively shears off any subjective element of the previously existing liability standard.  As explained above, this position cannot be correct, because it rests on the self-contradictory premise that one can violate the clearly established law at the time without even violating the law at the time. *See supra* at 54.  Although the majority argues that its position is required by Ninth Circuit precedent, its ruling here is both contrary to our caselaw and creates a split with at least three other circuits.

**a**

The majority wrongly asserts that its approach was endorsed in *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019), where we observed that, under *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002), the qualified immunity inquiry in a deliberate indifference case "should *concentrate* on the objective aspects of the constitutional standard." *Horton*, 915 F.3d at 600 (emphasis added).  But as a review of our decisions in *Estate of Ford* and *Horton* confirms, this observation merely reflects the fact that, in most deliberate indifference cases, the subjective elements of the liability standard have little work to do at the qualified immunity stage, so that the resulting focus should ordinarily be on the objective aspects.

The fact that, as a practical matter, the inquiry should ordinarily "concentrate" on the objective aspects does not imply (as the majority would have it) that *any* consideration of the subjective aspects of the test is forbidden, and in fact *Horton* clearly rejects the majority's view.

In *Estate of Ford*, we addressed the continued validity of our prior decision in *Hamilton v. Endell*, 981 F.2d 1062 (9th Cir. 1992), which had held that a "finding of deliberate indifference *necessarily* precludes a finding of qualified immunity" inasmuch as "prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Id.* at 1066 (first emphasis added). *Estate of Ford* did not dispute *Hamilton*'s underlying premise that, with respect to the *subjective* aspect of the deliberate indifference test, the constitutional merits inquiry and the qualified immunity inquiry collapsed into one another.   But given the Supreme Court's subsequent emphasis on maintaining the distinction between the underlying merits of a claim and the qualified immunity inquiry, *Estate of Ford* concluded that *Hamilton* had erred in completely "collaps[ing] the deliberate indifference part of the constitutional inquiry into the qualified immunity inquiry." 301 F.3d at 1050 (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  As *Estate of Ford* explained, in addition to the subjective element, the deliberate indifference test has "an objective component as well," and with respect to *that* component, the merits inquiry and the qualified immunity inquiry do *not* collapse together.  *Id.* at 1049–50.  Because the objective component of the deliberate indifference test requires a "substantial risk of serious harm," a "reasonable prison official" could know all the relevant facts and "yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high."  *Id.* at 1050.  In such

circumstances, an officer "would be entitled to qualified immunity" despite the subjectively malign disregard of what was wrongly (but reasonably) perceived to be a minor risk. *Id*.

*Estate of Ford* thus did not hold that the qualified immunity inquiry is exclusively objective and that it affirmatively disregards any subjective elements of the underlying liability standard. Rather, *Estate of Ford* recognized that, when the underlying liability standard remains unchanged and has both subjective and objective components, the merits inquiry and the qualified immunity inquiry will overlap completely with respect to the *subjective* element, but that the same cannot be said of the objective element. 301 F.3d at 1049–50. In such circumstances, the qualified immunity inquiry will necessarily focus on the objective aspects of the test, because the subjective component of the test "does not fit easily with the qualified immunity inquiry." *Id*. at 1049.

But the situation is different if, *after* the defendant acted, the subjective element of the liability standard is modified or eliminated. In that circumstance, the merits inquiry (which no longer has that subjective element) will *not* overlap completely with the qualified immunity inquiry (which, because it examines the law at the time the defendant acted, still does have a subjective element). Thus, in contrast to the situation in *Hamilton* and *Estate of Ford*, the merits and qualified immunity inquiries in the change-of-law scenario do not collapse into each other with respect to the previously applicable subjective element of the liability test. In such a case, the court therefore must separately consider at the qualified immunity stage whether the Defendants violated the law *at the time* of the conduct, which includes a

consideration of the since-rejected *subjective* deliberate indifference standard.

Our decision in *Horton*, which involved the "attempted suicide of a jailed pretrial detainee," confirms this analysis. 915 F.3d at 596.  The district court in *Horton*, applying the then-applicable subjective test, denied qualified immunity to defendant police officer Brice, holding that "there is a genuine issue of fact regarding whether Officer Brice acted with deliberate indifference to Horton's safety." *Id*. at 598. Consistent with *Estate of Ford*, we recognized that, "even where the *clearly established* legal standard requires *deliberate* indifference"—as it did at the time Brice acted— "the qualified immunity inquiry should concentrate on the objective aspects of the constitutional standard." *Id*. at 600 (emphasis added).  Under *Estate of Ford*, the fact that there was a triable issue as to Brice's subjective knowledge under the "clearly established legal standard" was not enough to defeat qualified immunity, because Horton also had to show that any reasonable officer would have known that Brice's actions *objectively* "presented such a substantial risk of harm to Horton that the failure to act was unconstitutional." *Id*. Reviewing the caselaw on that objective aspect of the qualified immunity inquiry at the time that Brice acted, we held that it was "too sparse, and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that Horton would imminently attempt suicide." *Id*. at 601–02.

Because we reversed the district court's denial of qualified immunity based on the objective elements of clearly established law, we expressly declined to consider, for qualified immunity purposes, how the subjective elements of the pre-*Castro* deliberate indifference test— which governed at the time of the conduct—applied to

Horton's case.  915 F.3d at 602.  But in discussing this issue, we expressly noted that the new *Gordon* objective standard would *not* govern this aspect of the inquiry.  The objective standard, we explained, would "guide our analysis" of the merits of "whether a constitutional violation occurred here, were we to reach that question," but "it has no direct bearing on the question of whether Officer Brice would have known that a failure to immediately check on Horton violated a *clearly established* right *at the time of the incident.*"  *Id.* (emphasis in original).  Because the subjective standard was no longer applicable to future cases and Brice's entitlement to qualified immunity had already been established on other grounds, "no purpose would be served for future cases from delineating the application of that [pre-*Castro*] standard to the constitutional merits of this case."  *Id.*  Thus, although our finding of qualified immunity based on the objective element of the pre-*Castro* test made it unnecessary to address the subjective element of the test under the previously applicable law, *Horton* clearly recognized—contrary to the majority's ruling—that the subjective element *remained* an aspect of "the two-step qualified immunity procedure" in the change-of-law scenario.  *Id.* The "rule of *Horton*," *see* Maj. Opin. at 30, is thus exactly the opposite of what the majority claims it is.

**b**

In addition to being inconsistent with our precedent, the majority's ruling creates a clear split with the decisions of at least three other circuits.  Indeed, the majority opinion candidly acknowledges that the Third, Eighth, and Tenth Circuits have held that courts addressing comparable claims must "apply a *subjective* framework for purposes of qualified immunity, even though it ha[s] since been replaced

by an objective standard." *See* Maj. Opin. at 38 n.15 (emphasis added).

For example, in *Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017), the Third Circuit addressed a substantive due process claim arising from an alleged "state-created danger" involving an accidental shooting during a firearms training exercise. *Id.* at 432. Although current Third Circuit law would apply an "objective" standard in addressing such a claim, the court held that this standard could not be applied to the qualified immunity inquiry because "the objective theory of deliberate indifference was not clearly established at the time of the shooting." *Id.* at 432. As the court explained, "we assess qualified immunity based on the law that was 'clearly established at the time an action occurred,'" and at the time of the shooting in *Kedra*, "it was not yet clearly established whether deliberate indifference in the substantive due process context was governed by an objective or subjective standard." *Id.* at 440 (citation omitted). The qualified immunity inquiry thus turned on whether the plaintiff had "pleaded deliberate indifference under the subjective test, which was then-clearly established," and after reviewing the complaint, the court concluded that the plaintiff had sufficiently alleged a "state-created danger based on actual knowledge of a substantial risk of serious harm—the *subjective* theory of deliberate indifference that was then-clearly established." *Id.* at 440, 444 (emphasis added).

Likewise, in *Hall v. Ramsey County*, 801 F.3d 912 (8th Cir. 2015), the Eighth Circuit held that any change in liability standards effected by the Supreme Court's decision in *Kingsley* could not have any impact on the qualified immunity analysis. The court there addressed a Fourteenth Amendment excessive force claim asserted by an

involuntarily committed person, and the court noted that the ruling in *Kingsley* suggested that such a claim would now be governed by an objective test. *Id*. at 917 n.3. But the court held that, because the question of qualified immunity turns on whether the law was "'clearly established at the time of the' alleged violation," the decision in "*Kingsley* does not [a]ffect the standard against which we evaluate the [defendants'] conduct in the qualified immunity analysis." *Id*. (citation omitted).

More recently, the Tenth Circuit similarly applied the subjective deliberate indifference test in addressing whether jail officials were entitled to qualified immunity with respect to claims that they had failed to provide necessary medical care to a pretrial detainee who was experiencing drug withdrawal symptoms. *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1027–28 (10th Cir. 2020). Applying the law that was established at the time the defendants acted, the court held that the qualified immunity analysis "requires both an objective and a subjective inquiry." *Id*. at 1028. In a footnote, the majority addressed Judge Bacharach's separate opinion concurring in part and dissenting in part and explicitly "endorse[d] Judge Bacharach's rejection of the argument that *Kingsley* . . . requires us to conduct only an objective inquiry." *Id*. at 1028 n.1. In the referenced discussion, Judge Bacharach explained that, although the "subjective prong" of the deliberate indifference test "has been altered for at least some claims involving pretrial detainees," the court had to "apply the subjective prong as it was clearly established at the time of [the plaintiff's] detention." *Id.* at 1038 n.2 (opin. of Bacharach, J.); *see also id*. at 1049 ("*Kingsley* did not clearly apply to pretrial detainees' claims of inadequate medical care, so the district court did not err in applying the subjective prong for purposes of qualified immunity."). The

Tenth Circuit's approach is thus also directly contrary to the majority's analysis here.  *See also Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) (to the extent that the governing standard was now "objective deliberate indifference, this lower standard wasn't clearly established as of" the date of the incident in question and could not be applied in analyzing qualified immunity).

Although the majority's position is directly contrary to that of the Third, Eighth, and Tenth Circuits, the majority claims that its approach is supported by the decisions of several other circuits.  *See* Maj. Opin. at 32–34.  That is doubtful.  Only two of these cases involved a claim of deliberate indifference to the serious medical needs of a pretrial detainee, and the court in both cases applied the subjective test in addressing qualified immunity.  *Dyer v. Houston*, 964 F.3d 374, 383–84 (5th Cir. 2020) (holding that confusion over the exact nature of the subjective element did not absolve the district court of having to decide whether the defendants were liable under the then-clearly established standards); *Hopper v. Plummer*, 887 F.3d 744, 756–57 (6th Cir. 2018) (declining to disturb district court's denial of qualified immunity in light of its "finding of a genuine issue of material fact as to defendants' 'knowledge of a substantial risk of serious harm'").

The majority instead cites the portion of *Hopper* that involved an *excessive force* claim, as well as two other decisions involving such claims.  *Hopper*, 887 F.3d at 755–56; *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64 (1st Cir. 2016); *Kingsley v. Hendrickson*, 801 F.3d 828 (7th Cir. 2015) (decision on remand from the Supreme Court's *Kingsley* decision).  The courts in all three of these cases dismissed the notion that any previously applicable subjective element of the excessive force test provided any

basis for granting qualified immunity, and to that extent those cases bear some arguable similarity to the majority's conclusion here.  *Hopper*, 887 F.3d at 755; *Miranda-Rivera*, 813 F.3d at 73; *Kingsley*, 801 F.3d at 831.  But there is a critical difference between the role of the subjective element in an excessive force claim (in which the officer *affirmatively* applies force, *see Kingsley*, 576 U.S. at 395–96) and a claim of deliberate indifference to serious medical needs (in which the official *fails to act*).  In excessive force cases in which the objective component of the qualified immunity inquiry is met—meaning that the officer has applied an objective level of force that *any* reasonable officer would know is excessive—there are likely to be few, if any, cases in which the officer who is *knowingly and affirmatively applying that force* could plausibly assert that he did not simultaneously act with the requisite subjective intent of "at least recklessness."  *Kingsley v. Hendrickson*, 744 F.3d 443, 453 (7th Cir. 2014) (describing the prior law in the decision that was later reversed by the Supreme Court in *Kingsley*).  In other words, satisfying the objective standard for qualified immunity in such excessive force cases almost certainly means that the subjective element is met as well.  By contrast, where the gravamen of the violation is a failure to act (as in the context of deliberate indifference to serious medical needs), the objective unreasonableness of a nurse's failure to detect a serious medical risk does not similarly lead to an inescapable conclusion that the nurse *must* have *actually* subjectively appreciated that risk.  People can, and do, sometimes subjectively overlook what they should obviously detect.

These three cases thus supply little support for the majority's sweeping rule that the qualified immunity inquiry is exclusively objective and requires courts to affirmatively and always disregard any subjective elements of the

previously clearly established law.  In all events, to the extent that these cases could be read to endorse the majority's flawed analysis, then they are wrong as well.[3]

*          *          *

Accordingly, each of the Nurses here is entitled to qualified immunity unless Plaintiff presented sufficient evidence to show (*inter alia*) that that Nurse was subjectively "'aware of facts from which the inference could be drawn that a substantial risk of serious harm [to Sandoval] exists,'" and that he or she actually "'dr[e]w the inference.'" *Conn*, 591 F.3d at 1096 (quoting *Farmer*, 511 U.S. at 837).

**B**

The district court correctly concluded that Plaintiff failed to create a genuine dispute of material fact under the applicable subjective standard as to Nurse Romeo de Guzman, but it erred in finding that Harris and Llamado were entitled to qualified immunity.

---

[3] The majority opinion also misleadingly quotes, out of context, the Supreme Court's observation in *Crawford-El v. Britton*, 523 U.S. 574 (1998), that "evidence of improper motive is irrelevant on the issue of qualified immunity." *Id*. at 589 (quoted at Maj. Opin. at 31). *Crawford-El* was merely referring to the now well-settled rule that an otherwise valid "defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated." *Id*. at 588. *Crawford-El* did not address the distinctive question presented here concerning how to apply qualified immunity principles in the context of a change in liability standards from subjective to objective.

## 1

The district court correctly held that Plaintiff had not presented sufficient evidence to permit a reasonable jury to find that de Guzman "was actually aware Sandoval had a serious medical need." As the district court noted, the undisputed evidence confirms that "Sandoval did not advise any prison official of his drug overdose condition"; on the contrary, he "lied and denied his use of drugs to Nurse de Guzman." In arguing that de Guzman nonetheless actually became subjectively aware of Sandoval's acute methamphetamine intoxication, Plaintiff places primary weight on two statements in the police report by one of the involved officers (Deputy Rodriguez): (1) de Guzman's statement, as recorded by Rodriguez, that Sandoval should be sent to a "sobering tank"; and (2) Rodriguez's own observation that Sandoval "was shaking mildly" and "appeared to be having withdrawal[] from drugs." While I agree with the majority that these statements in this document should not have been held inadmissible,[4] neither

---

[4] In opposing Defendants' summary judgment motion below, Plaintiff specifically argued that the police reports she submitted are not hearsay under Federal Rule of Evidence 803(8). That statement was sufficient to preserve this position, notwithstanding Plaintiff's subsequent failure to file any response to the evidentiary objections that Defendants submitted with their reply, and the district court therefore erred in concluding that Plaintiff forfeited her admissibility arguments concerning those reports. We have explained that police reports are admissible under Rule 803(8) as to the reporting officer's own observations, *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983), and we have also explained that statements made to a government official and recorded in an official report may also be admissible if they are covered by a separate hearsay exception (or if they are not themselves hearsay), *see United States v. Morales*, 720 F.3d 1194, 1202 (9th Cir. 2013). Under this framework, any statements of de Guzman that are

of these statements creates a triable issue as to de Guzman's subjective awareness of Sandoval's medical predicament.

As to the first statement, de Guzman's suggestion that Sandoval should be sent to a "sobering tank" does not support a reasonable inference that de Guzman was *subjectively* aware that Sandoval faced a serious medical need. If anything, it shows the exact opposite. I agree with Plaintiff that this comment supports an inference that de Guzman was aware that Sandoval might be under the influence of something,[5] but that is not enough to carry Plaintiff's burden of proof. Plaintiff had to show that de Guzman was subjectively aware that Sandoval was under the influence *in a manner that presented a serious medical need*. De Guzman's "sobering tank" comment is insufficient to permit a jury to draw that inference. On the contrary, the suggestion that Sandoval should be removed from the current cell adjacent to the nurses' station ("Medical Observation Cell #1" or "MOC1") and sent to a sobering cell *negates* any suggestion that de Guzman actually drew the inference that Sandoval faced a serious medical need. Because de Guzman knew that an inmate in a sobering cell would only be checked every four hours, his suggestion that Sandoval could be sent there reflects, at most, a subjective

---

recorded in Rodriguez's report would be admissible against de Guzman as a non-hearsay opposing-party statement. *See* FED. R. EVID. 801(d)(2).

[5] That inference is further supported by de Guzman's comment, during his deposition, that he may have overheard an officer say "[s]omething like—'I just found out that [Sandoval's] under the influence.'"

belief that Sandoval was under the influence in a manner that did *not* present a substantial risk of serious harm.[6]

Plaintiff argues that, in light of an additional statement in Rodriguez's report, a reasonable jury could find that de Guzman was aware that Sandoval's condition was serious. Specifically, Plaintiff notes that, in his report, Rodriguez stated that "Sandoval appeared to be having withdrawal[] from drugs."  But as the district court noted, Rodriguez's report does *not* say that Rodriguez ever *told* de Guzman that he (Rodriguez) thought Sandoval was experiencing withdrawal symptoms—much less that Sandoval was experiencing symptoms that suggested a substantial risk of serious harm.

None of the other evidence cited by Plaintiff would permit a reasonable jury to find that de Guzman became subjectively aware that Sandoval's situation presented a substantial risk of serious harm.  Plaintiff points out that, in response to de Guzman's suggestion that Sandoval should be moved to a sobering cell, Deputy Wilkinson and Corporal Powell relayed back to de Guzman their view that Sandoval should stay in MOC1, but Plaintiff does not point to any evidence that Wilkinson or Powell ever told de Guzman that they thought that Sandoval faced any specific, much less serious, medical risk.  Plaintiff cites only Rodriguez's report, but that report merely states that Wilkinson and Powell

---

[6] The majority surmises that perhaps de Guzman knew that Sandoval had a serious medical need but nonetheless wanted to send him to a sobering cell because de Guzman "did not want to deal with the hassle of providing" the necessary care. *See* Maj. Opin. at 42 n.16.  No record evidence supports the majority's speculation, which provides no basis for denying summary judgment here. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

"determined it would be better if Sandoval remained in [his] observation cell"; it does not state that they provided any details as to *why* they had that view (much less whether they had determined that Sandoval faced any sort of serious medical need).

Because Plaintiff failed to present sufficient evidence to show that de Guzman was subjectively aware of Sandoval's serious medical needs, de Guzman was entitled to qualified immunity.  I therefore dissent from the majority's reversal of the district court's grant of summary judgment to de Guzman.

**2**

Under the correct qualified immunity standards, I conclude that Nurse Dana Harris was not entitled to summary judgment.

Plaintiff has presented ample evidence to support her theory that, under an *objective* standard, Harris was grossly incompetent because she did not understand that in San Diego, the Emergency Medical Technicians ("EMTs") that she had initially summoned could not perform the Advanced Cardiac Life Support ("ACLS") that Sandoval needed.  But as explained earlier, the qualified immunity inquiry also has a *subjective* component and requires Plaintiff to present sufficient evidence to establish that Harris was subjectively aware that her actions were creating or exacerbating a substantial risk of serious harm.  I agree with Plaintiff that the evidence in the summary judgment record is sufficient to permit a jury to find that Harris was subjectively aware that Sandoval was having a seizure and that the seizure posed a substantial risk of serious harm, but that is not enough to show that Harris acted with deliberate indifference.  Rather, Plaintiff had to show that Harris was subjectively aware that

her *response* to the situation was inadequate and placed Sandoval at a substantial risk of serious harm. But Plaintiff's above-described theory that Harris was "[t]oo [i]ncompetent" to subjectively know that EMTs could not perform ACLS is affirmatively *inconsistent* with the view that Harris subjectively drew the inference that her actions were placing Sandoval at a substantial risk of serious harm. Accordingly, under this view of the evidence, the very fact of Harris's subjective obliviousness would entitle her to qualified immunity.

Nonetheless, I believe that the district court erred in granting summary judgment to Harris. In my view, the sharply conflicting evidence in the summary judgment record is sufficient to permit the *alternative* inference that Harris *did* subjectively know that she needed to call 911 for paramedics (who could perform ACLS) and that EMTs would be inadequate, but that for whatever reason (*e.g.*, panic, stubbornness, foolishness, etc.), she refused to do so. Although Harris insisted that no one told her to call 911 or paramedics, Plaintiff presented competing evidence that: (1) Deputy Matthew Andrade (who had himself been trained as an EMT) told Harris two or three times that paramedics should be called; (2) very early into the emergency, Nurse Llamado concluded that "9-1-1 should be called," and she said out loud to Harris and the others multiple times that Sandoval "has to go out 9-1-1"; (3) after consulting with the supervising nurse (Shirley Bautista), Llamado told Harris that "Shirley said he has to go now 9-1-1"; and (4) Llamado confirmed that calling paramedics was "[s]tandard nursing protocol" at the jail in the case of a prolonged seizure. Based on this evidence, a rational jury could readily conclude that Harris well knew that she needed to call 911 and inexplicably failed to do so. *See Farmer*, 511 U.S. at 842 ("Whether a[n] . . . official had the requisite knowledge of a

substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."). And, based on the same evidence, a jury could reasonably conclude that the resulting deprivation was "*objectively* . . . sufficiently serious," thereby satisfying the objective component of then-existing law concerning deliberate indifference to serious medical needs. *Estate of Ford*, 301 F.3d at 1049.

Moreover, I would further conclude that, under then-existing law, it was *clearly established* that Harris's conduct violated Sandoval's constitutional rights. Long before this incident, the Supreme Court had held that, to show deliberate indifference to a serious medical need, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Given that the evidence here amply supports the view that Harris subjectively knew that paramedics needed to be called to avoid objectively serious harm to Sandoval, and given that Harris's behavior was so obviously objectively unreasonable, it follows that, "at the time of [Harris's] conduct, the law was 'sufficiently clear' that *every* '*reasonable official* would understand that what [s]he is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (emphasis added). Harris therefore violated clearly established law at the time she acted. *See id*.

The only remaining question is whether, under *existing* law, Harris deprived Sandoval of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). I agree with the majority that Plaintiff presented sufficient evidence to permit a jury to find that Harris violated Sandoval's constitutional rights under the now-governing objective test set forth in *Gordon*. *See* Maj. Opin. at 39–40.

For the foregoing reasons, I concur in the judgment reversing the grant of summary judgment to Harris.

**3**

For substantially similar reasons, I concur in the judgment reversing the district court's grant of summary judgment to Nurse Maria Llamado.  Indeed, Plaintiff's evidence as to Llamado is, if anything, even stronger than as to Harris.  Llamado's own deposition testimony confirms that she was subjectively aware that Harris was wrong in summoning only EMTs and not paramedics.  Llamado also admitted at her deposition that she should have called paramedics herself, stating that she had "learned [her] lesson."  Under the facts that could reasonably be found by the jury on this record, Llamado violated Sandoval's clearly established rights under then-existing law, and her actions also violated Sandoval's rights under current law.  Summary judgment for Llamado was therefore improper.

**III**

In my view, the district court correctly granted summary judgment to the county on Plaintiff's § 1983 claims against it, and I therefore dissent from that aspect of the majority's judgment.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a local government entity "may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).  To establish such liability, Plaintiff "must prove (1) that [Sandoval] possessed a constitutional right of which [he] was deprived; (2) that the municipality had a policy; (3) that

*this policy amounts to deliberate indifference to* [*Sandoval's*] *constitutional right*; and, (4) that the policy is the moving force behind the constitutional violation." *Id.* (citation and internal quotation marks omitted) (emphasis added). Plaintiff contends that the county was deliberately indifferent in having a policy or practice of using MOC1 as a "mixed use" cell "for both correctional and medical purposes" without imposing "appropriate safeguards," such as "routine medical monitoring, tracking logs and proper . . . procedures" for transmitting information to incoming nurses at the end of a given nurse's shift. On the record presented at summary judgment, this contention fails as a matter of law, and summary judgment was properly granted.

Negligence alone is insufficient to plead a constitutional tort, *see County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998), and Plaintiff concedes that she must go further and show that the policy, practice, or custom she challenges "amounts to *deliberate indifference* to the plaintiff's constitutional right," *Dougherty*, 654 F.3d at 900 (emphasis added). The applicable "deliberate indifference" standard for *Monell* claims, however, differs from the above-discussed standard that applied to the individual Defendants under then-existing law for qualified immunity purposes: whereas the latter applies both an objective and a subjective standard, the former is purely objective. *See Farmer*, 511 U.S. at 840–41; *Castro*, 833 F.3d at 1076. In the context of an analogous claim about inadequate monitoring of jail cells, we held in *Castro* that the objective deliberate indifference standard for municipal liability under § 1983 requires a showing that "'the facts available to city policymakers put them on actual *or constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Id.* at 1076 (citation omitted); *see also Board of Cnty. Comm'rs*

*v. Brown*, 520 U.S. 397, 410 (1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").

Plaintiff failed to present sufficient evidence to satisfy this demanding standard, and the county was therefore entitled to summary judgment. Plaintiff's evidence of prior confusion concerning why particular inmates were placed in MOC1 may well support a claim that the county was negligent,[7] but that evidence does not come close to showing that the county had "'*actual or constructive notice*'" that this practice was "'*substantially certain*'" to result in an unconstitutional disregard of a serious medical need. *Castro*, 833 F.3d at 1076 (citation omitted) (emphasis altered). The fact that the county changed its practices concerning MOC1 after this incident—even if admissible for purposes going beyond merely proving that a policy, practice, or custom existed, *but see Conn*, 591 F.3d at 1104 n.7 (applying Fed. R. Evid. 407 to cabin the use of post-event practice)—does not establish that the county had the pre-incident actual or constructive notice *Castro* requires. I therefore disagree with the majority's finding that a reasonable jury could infer that the county had actual or constructive knowledge that its practices in regard to the

---

[7] The Plaintiff opening brief cites as evidence of confusion a comment by one of her experts that the county's practice "created a constant state of chaos and lack of communication between the deputies and the nursing staff." The expert's lengthy report, however, cites nothing in the record to support this particular remark. Nurse Llamado and Shirley Bautista, the charge nurse on the night in question, also testified that the mixed-used nature of MOC1 was confusing to nursing staff. However, this evidence of confusion does not create a triable issue under the *Castro* standard.

MOC1 cell were substantially certain to result in an unconstitutional disregard of a serious medical need.

Plaintiff contends that the constructive notice standard should not apply because here the county's "policy itself directs the unconstitutional action." Plaintiff, however, has presented no evidence that the policy *itself* is unconstitutional. In particular, to the extent that Plaintiff contends that the county had an unconstitutional policy, practice, or custom to affirmatively and completely ignore persons placed in MOC1, there is no evidence that the county had such a policy: it is undisputed that the MOC1 cell is visible to personnel at the nurses' station; and, indeed, it is undisputed that Sandoval's eventual seizure and collapse onto the floor was immediately detected.

For the foregoing reasons, I concur in the judgment in part and respectfully dissent in part.